STEWART BROWNE, Respondent, *v.* THE CITY OF NEW YORK et al., Appellants.

WILLIAM J. SCHIEFFELIN, Respondent, *v.* WILLIAM W. MILLS, as Commissioner of Plant and Structures of the City of New York, et al., Appellants.

Constitutional law — City Home Rule Law — New York city — mandate of people may not be nullified by limitations read into Constitution by dubious construction — amendment to Home Rule article of Constitution (Art. 12) regular and valid — that article upon which amendment was to operate was not the same in both years during which amendment was acted upon by Legislature immaterial — requirement that proposed amendments shall be entered upon journals of Senate and Assembly sufficiently complied with by entry of title — City Home Rule Law legally enacted — city of New York empowered neither by Constitution nor statute to carry on business of common carrier of passengers as original project.

1. While it is the duty of courts to maintain the integrity of constitutional government by adhering to the limitations laid by the sovereign people upon the expression of its will, not less imperative is the duty to refuse to magnify their scope by resort to subtle implication. When an article of the Constitution has been ratified by popular vote after acceptance by two Legislatures, separately chosen, the courts would be discrediting constitutional government rather than supporting it if they were to hold that limitations read into the text of the Constitution by dubious construction could nullify the mandate of the people and the people's representatives.

2. The amendment at the general election of 1923 of article 12 of the State Constitution (the so-called Home Rule article) was regular and valid and said article as amended became on January 1, 1924, and now is a part of the Constitution of the State.

3. A holding that the amendment is abortive because between the session of the Legislature held in 1922 and the session held in 1923, article 12 had been changed with the result that the article upon which the amendment was to operate was not the same when the amending resolution was adopted by the Legislature of 1923 as it was when the same resolution was adopted in 1922, cannot be sustained, where, although the article upon which the amendment was

to operate was not the same in the two years, the amendment itself, the new or substituted article, was identical in both years and was thereafter approved by the electors. · There is neither precedent nor adequately persuasive reason to support an implication that into the command that two Legislatures shall accept an amendment before submission to the people should be read a condition that the article displaced or superseded shall remain unvaried in the interval.

4. The requirement of article 14 of the Constitution that proposed amendments shall be entered on the journals of the Senate and Assembly was sufficiently obeyed where the amendments, though not entered at large, were entered by their title upon every reading with a record of the ayes and noes.    (*State ex rel. Postel* v. *Marcus*, 160 Wis. 352, 380–382, approved.)

5. Under the authority of article 12 of the State Constitution, as amended, the City Home Rule Law (Cons. Laws, ch. 76; L. 1924, ch. 363) was legally enacted, but neither that article nor the statute empowers the city of New York to carry on the business of a common carrier of passengers by acquiring municipal buses and itself maintaining and operating them.   At the time of the adoption of the City Home Rule Law the city was without power under its charter to lay out a route for buses and engage in the business of a common carrier of passengers and nothing contained in that law gives it the privilege to confer that power upon itself.   Neither the Constitution of New York nor the City Home Rule Law confers upon the cities of this State blanket powers to frame their own governments, but under the statute local laws to be valid must touch a city in its property, affairs or government in one or more of certain enumerated ways and none of these are adequate to sustain the power asserted by the city to engage as an original project in the business of transportation.

6. The attempted amendment of the charter relates to something more than " the powers, duties, qualifications, number, mode of selection and removal, terms of office " or " compensation " of " officers and employees of the city," made subject by the statute to local laws.   It is an enlargement of the powers of the city itself, and this may not be done under the guise of an amendment of the powers of its agents.

7. The attempted amendment of the charter of the city also relates to something more than the permitted " acquisition, care, management and use of its streets and property."   The city's disability in respect ·of the maintenance of bus lines was due to the fact that the city had been denied the general power to carry on the business of a common

carrier of passengers and the difficulty has not been removed by permitting it to regulate the use of streets.

8. Nor was there any thought, in enacting that the city might make laws for "the government and regulation of the conduct of its inhabitants and the protection of their property, safety and health," that it would be made to bear the burden of a system of transportation, to be paid for with public moneys and maintained by public officers. Implication so extensive is illegitimate when there was demand as well as opportunity for unequivocal expression.

*Browne* v. *City of New York*, 213 App. Div. 206, affirmed.
*Schieffelin* v. *Mills*, 213 App. Div. 206, affirmed.

(Argued September 1, 1925; decided October 6, 1925.)

APPEAL in both of the above-entitled actions, by permission, from orders of the Appellate Division of the Supreme Court in the first judicial department, entered July 13, 1925, which reversed orders of Special Term denying motions for injunctions *pendente lite* and granted said motions. Also appeal, by permission, from orders of said Appellate Division, entered July 13, 1925, which reversed orders of Special Term granting motions by defendants for a dismissal of the complaint and denied said motions.

The following question was certified in both actions: "Does the complaint state facts sufficient to constitute a cause of action?"

*George P. Nicholson, Corporation Counsel (Frank C. Laughlin* and *Bainbridge Colby* of counsel), for appellants. Constitutions spring from the people, and any restriction or limitation they have placed upon themselves with respect to the amendment thereof, should be liberally construed in their favor, and it should not be held that they have precluded themselves from exercising the power vested in them to amend the Constitution beyond the extent to which such restrictions or limitations have been clearly expressed. (*Rathbone* v. *Wirth*, 6 App. Div. 288; *People* v. *Young*, 18 App. Div. 167; *People ex rel. C. T. Co.* v. *Prendergast*, 202 N. Y. 188; *Hammond* v. *Clarke,*

136 Ga. 313; *Secombe* v. *Kittelson*, 29 Minn. 555; *State ex rel. Thompson* v. *Winnett*, 78 Neb. 379; *Manos* v. *State*, 263 S. W. Rep. 310; *Armstrong* v. *King*, 281 Penn. St. 207; *Hollinger* v. *King*, 282 Penn. St. 157; *State* v. *Alderson*, 49 Mont. 387.) Authority to establish and operate municipal bus lines without first granting a franchise and then reclaiming it was conferred upon the city both by article 12 of the Constitution of the State of New York, as adopted by the people in 1923, which took effect on the 1st day of January, 1924, and by the City Home Rule Law (L. 1924, ch. 363; Cons. Laws, ch. 76). (*B. C. R. R. Co.* v. *Whalen*, 191 App. Div. 737; 229 N. Y. 570; *Shafer* v. *Hylan*, 206 App. Div. 747; *Cleveland* v. *City of Watertown*, 222 N. Y. 159; *Sun Pub. Assn.* v. *Mayor, etc.*, 152 N. Y. 257; *Admiral Realty Co.* v. *City of New York*, 206 N. Y. 110.) Under the provisions of article 12, and under the provisions of the City Home Rule Law, local laws Nos. 3, 4 and 5 are valid enactments. (*Platt* v. *City & Co.*, 158 Cal. 74; *Denver* v. *Telegraph Co.*, 67 Colo. 225.) The municipal assembly of the city of New York, as a precautionary measure, undertook by local law No. 6 to amend or supersede section 24 of the Transportation Corporations Law to except the city therefrom; but that was unnecessary for the reason that it relates only to franchises to be granted to private corporations or individuals and does not apply to municipal corporations, and the establishment and operation of municipal bus lines, as contemplated, does not involve the granting of a franchise or the exercise of franchise rights within the contemplation of the provisions of the charter and of the Transportation Corporations Law, and consequently no certificate of convenience and necessity is required from the Transit Commission. (*Demarest* v. *Mayor, etc.*, 74 N. Y. 161; *Trenton* v. *New Jersey*, 262 U. S. 182; *East Hartford* v. *Hartford Bridge Co.*, 10 How. [U. S.] 511; *City of New York* v. *B. C. R. R. Co.*, 232 N. Y. 463; *Schnitzel* v. *Best*,

45 Misc. Rep. 455; *Trustees of Southampton* v. *Jessup,* 162 N. Y. 122.)

*Robert C. Cumming* and *William F. McCormack* for Home Rule Commission, intervenor. If there be any doubt of the validity of the Home Rule amendment that doubt should be resolved in favor of validity, in view of the irreparable public mischief that would ensue from invalidating the amendment. (*People ex rel. Everson* v. *Lorillard,* 135 N. Y. 285.) The failure to spread at length the proposed Home Rule amendment on the journals of the Senate and Assembly did not vitiate such amendment. (*Oakland Paving Co.* v. *Hilton,* 69 Cal. 479; *Oakland Paving Co.* v. *Tompkins,* 72 Cal. 5; *Koehler* v. *Hill,* 60 Iowa, 543; *State* v. *Brookhart,* 113 Iowa, 250; *Lee* v. *Price,* 181 Pac. Rep. 948; *Martien* v. *Porter,* 219 Pac. Rep. 817; *Boyd* v. *Olcott,* 202 Pac. Rep. 431; *Ex parte Ming,* 181 Pac. Rep. 319; *State ex rel. Twichell* v. *Hall,* 171 N. W. Rep. 213; *Worman* v. *Hagan,* 78 Md. 152.)

*Albert De Roode* for New York State Association, *amicus curiæ.* The text of a constitutional amendment need not be entered " at large " upon the journals of each house of the Legislature. (*Oakland Paving Co.* v. *Tompkins,* 72 Cal. 5; *People* v. *Strother,* 67 Cal. 624; *State ex rel. Postel* v. *Marcus,* 160 Wis. 354; *Prohibitory Amendment Cases,* 24 Kans. 700; *Warman* v. *Hagan,* 78 Md. 152.) The amendment voted upon at the general election in 1923 having been proposed in the constitutional manner became effective regardless of what had happened to the specific section of the Constitution amended. (*Matter of Allison* v. *Welde,* 172 N. Y. 421.)

*Albert Ottinger, Attorney-General* (*C. T. Dawes* of counsel), *amicus curiæ.*

*Frederick C. Rupp, Corporation Counsel* (*Carl Sherman* of counsel), for City of Buffalo, intervenor.

*Louis Marshall* for Stewart Browne, respondent. The alleged amendment of article 12 of the Constitution, claimed to have been adopted at the general election held in November, 1923, is null and void, because of non-compliance with the prescribed requirements of article 14 of the Constitution, as to the manner of proposing, submitting and adopting amendments. (*People* v. *Purdy,* 2 Hill, 32; 4 Hill, 384; *Newell* v. *People,* 7 N. Y. 97; *People* v. *Rathbone,* 145 N. Y. 434; *Collier* v. *Frierson,* 24 Ala. 100; *Oakland Paving Co.* v. *Hilton,* 69 Cal. 479; *Livermore* v. *Waite,* 102 Cal. 113; *Opinion of Justices,* 6 Cush. 574; *State* v. *Tooker,* 15 Mont. 8; *Durfee* v. *Harper,* 22 Mont. 354; *Crawford* v. *Gilchrist,* 64 Fla. 41.) A further reason why the action of the Legislature with regard to the proposed amendment set forth in Schedules G and H became a nullity, is the failure of the Senate and Assembly, at the time when they undertook to pass the Concurrent Resolution, Schedule G, to enter the proposed amendment on their journals with the yeas and nays taken thereon. (*Oakland Paving Co.* v. *Hilton,* 69 Cal. 479; *Koehler* v. *Hill,* 60 Iowa, 543; *State* v. *Brookhart,* 113 Iowa, 250; *People* v. *Loomis,* 135 Mich. 156; *State* v. *Marcus,* 160 Wis. 354.) Even if article 12 of the Constitution had been amended in the terms set forth in Schedule H, chapter 363 of the Laws of 1924 could not have authorized, and it does not, the enactment by the municipal assembly of local laws Nos. 3, 4, 5 and 6 set forth in Schedules I, J, K and L of the complaint. (*People ex rel. Einsfeld* v. *Murray,* 149 N. Y. 379; *Admiral Realty Co.* v. *City of New York,* 206 N. Y. 110; *Matter of McAneny* v. *Board of Estimate,* 232 N. Y. 378; *Bridges* v. *Thomas,* 8 Okla. 620; *Fragley* v. *Phelan,* 126 Cal. 383; *Palmer* v. *Behmer,* 100 Pac. Rep. 901.)

*Leonard M. Wallstein* and *Ralph M. Frink* for respondent. The phrase " property, affairs or government of cities," as used in the Home Rule Amendment and the

City Home Rule Law to define the field of power withdrawn conditionally from the Legislature and granted to the cities, is precisely the same 'phrase as was used in the former section 2 of article 12 of the Constitution. It was purposely so used in the amendment, because it had been in the original section and because as there used it had been judicially construed. Such judicial construction of the phrase determines its meaning as employed in the amendment and in the act. (*People ex rel. Outwater* v. *Green*, 56 N. Y. 466; *People* v. *Richards*, 108 N. Y. 137; *Matter of Rochester E. R. Co.*, 123 N. Y. 351; *Pulitzer* v. *City of New York*, 48 App. Div. 6; *Halsey* v. *Dramatic Co.*, 114 App. Div. 420.) The phrase " property, affairs or government " of cities has been authoritatively construed to exclude the regulation or operation of public utilities, particularly transit utilities; and such rulings are not negligible as *obiter dicta*. (*People ex rel. Einsfeld* v. *Murray*, 149 N. Y. 367; *Admiral Realty Co.* v. *City of New York*, 206 N. Y. 110; *McAneny* v. *Board of Estimate*, 232 N. Y. 377; *Sun P. & P. Assn.* v. *Mayor, etc.*, 152 N. Y. 257.) The provision in section 3 of the amendment in relation to the city's jurisdiction over streets does not authorize the Craig bills. (*B. C. Ry. Co.* v. *Whalen*, 191 App. Div. 737; 229 N. Y. 570; *Kingsbridge Ry. Co.* v. *City of New York*, 204 App. Div. 369; *Huff* v. *City of New York*, 202 App. Div. 425; *Schafer* v. *City of New York*, N. Y. L. J. Oct. 5, 1922; 206 App. Div. 747.) The legislative history of the Home Rule Amendment, of the City Home Rule Law and of other contemporaneous proposals, both standing alone, and together with the well-known public discussion of the same, demonstrates clearly the definite and carefully considered intention that there should be no grant to cities of power to operate or regulate public utilities. (*De Bow* v. *People*, 1 Denio, 9; *Bank* v. *Sparrow*, 2 Denio, 97; *People* v. *Supervisors*, 8 N. Y. 317; *Development Co.* v. *Kennedy*, 158 App. Div. 398; *State* v. *Polacheck*, 101

Wis. 427; *Jackson* v. *State*, 101 Ark. 473; *Wells* v. *M. P. Co.*, 110 Mo. 286; *Connole* v. *Railway*, 216 Fed. Rep. 823; *United States* v. *Pons*, 34 Phillip, 729.)　The Home Rule Amendment, when agreed to by each of the two houses of the Legislature of 1922, was duly entered on the journals of each such house of the Legislature. (*Copper Queen Co.* v. *Arizona Board*, 206 U. S. 479; *United States* v. *Hermanos*, 209 U. S. 337.)　The popular approval in 1922 of the clerk's amendment to section 2 of article 12 did not nullify the then pending Home Rule Amendment. (*Newell* v. *People*, 7 N. Y. 97; *People* v. *Rathbone*, 145 N. Y. 434; *State* v. *Tooker*, 15 Mont. 8; *People ex rel. Hatch* v. *Riordon*, 184 N. Y. 431; *People* v. *Lyon*, 77 Misc. Rep. 377.)

CARDOZO, J.　These are taxpayers' actions to enjoin the city of New York and the public officers thereof from disbursing public moneys under the authority of local laws.

The local laws, adopted by the Municipal Assembly, depend for their validity upon the City Home Rule Law, enacted in 1924 by the Legislature of the State (Consol. Laws, chap. 76; L. 1924, ch. 363), and this in turn depends upon article XII, §§ 2, 3, 4, 5 and 7 of the State Constitution, as amended at the general election of 1923. The plaintiff Browne maintains that the process of amendment was irregular, and hence that the attempted change of the Constitution is to be disregarded as abortive. The plaintiff Schieffelin concedes the validity of the amendment and of the statute passed thereunder, but finds no authority in either for such powers as are claimed by the local legislative body.　In this latter position the plaintiff Browne agrees with him.　The first line of attack would undermine the power of the locality by force of constitutional limitations.　The second would undermine it by the milder weapon of construction.　Both forms of assault failed at the Special Term, which denied

a motion for an injunction, and dismissed the complaint. Both prevailed at the Appellate Division, which denied the defendants' motion for judgment and granted the injunction.

(1) "Any amendment or amendments to this Constitution may be proposed in the senate and assembly; and if the same shall be agreed to by a majority of the members elected to each of the two houses, such proposed amendment or amendments shall be entered on their journals, and the yeas and nays taken thereon, and referred to the legislature to be chosen at the next general election of senators, and shall be published for three months previous to the time of making such choice; and if in the legislature so next chosen, as aforesaid, such proposed amendment or amendments shall be agreed to by a majority of all the members elected to each house, then it shall be the duty of the legislature to submit each proposed amendment or amendments to the people for approval in such manner and at such times as the legislature shall prescribe; and if the people shall approve and ratify such amendment or amendments by a majority of the electors voting thereon, such amendment or amendments shall become a part of the Constitution from and after the first day of January next after such approval" (Constitution, art. XIV, § 1).

We are to determine whether the amendment of article XII approved by the people at the election of 1923 has complied with these requirements.

The Constitution of 1894 as it was framed by the convention and ratified by the electors provided in article XII for a slender measure of home rule by conferring upon the mayors of cities, though under conditions closely limited, a power of suspensive veto. Cities were divided into three classes dependent upon population. Laws relating to the property, affairs or government of cities, and the several departments thereof, were divided into general and special city laws. General city laws were those relat-

ing to all the cities of one or more classes, and special city
laws those relating to a single city or less than all the cities
of a class.    When a bill for a special city law had been
passed by both branches of the Legislature, a copy was
to be transmitted to the mayor of the city affected thereby,
who was to return the bill to the house from which it was
sent, with or without his acceptance of its provisions.
Whenever any such bill was accepted, it became subject
like other bills to the action of the Governor.    Whenever
during the session at which it was passed, the bill was
returned without acceptance or within fifteen days was
not returned, it might nevertheless again be passed by
both branches of the Legislature, and then became subject
like other bills to the action of the Governor.

Experience taught the need of supplementing these
provisions by regulations more precise.    A bill was to be
returned to " the house " from which it had been sent,
but there was no description of the person or official to
whom it was to be addressed.    To remedy this defect the
Legislature of 1920 adopted a resolution for the amend-
ment of section 2 of article XII by substituting for the
provision that the bill should be returned to the house from
which it had been sent, a provision that it should be
returned to " the clerk " of such house.    No other change
was made.    The resolution, after being referred to the
Legislature of 1921, was adopted again by the Legislature
of 1922, and at the election of 1922 it was ratified by the
people.    If the proceedings leading up to its submission
to the electors were regular, it became part of the
Constitution on the first of January following.

This same Legislature of 1922 which had thus repassed
the resolution proposed by the Legislature of 1920,
initiated another resolution for the amendment of article
XII by establishing a comprehensive system of home rule
for the cities of the State, and referred the resolution
thus initiated to the Legislature of 1923.    The Legis-
lature of 1923 repassed the resolution in the form in which

it had been proposed, and at the general election of 1923 it was approved by the electors. By this revision, section 1 of article XII (as amended in 1905) was continued without change, and new sections were adopted numbered 2 to 7 inclusive. We quote them all in full:

## " ARTICLE XII.

" § 1. It shall be the duty of the Legislature to provide for the organization of cities and incorporated villages, and to restrict their power of taxation, assessment, borrowing money, contracting debts, and loaning their credit, so as to prevent abuses in assessments and in contracting debt by such municipal corporations; and the Legislature may regulate and fix the wages or salaries, the hours of work or labor, and make provision for the protection, welfare and safety of persons employed by the State or by any county, city, town, village or other civil division of the State, or by any contractor or subcontractor performing work, labor or services for the State, or for any county, city, town, village or other civil division thereof.

" § 2. The Legislature shall not pass any law relating to the property, affairs or government of cities, which shall be special or local either in its terms or in its effect, but shall act in relation to.the property, affairs or government of any city only by general laws which shall in terms and in effect apply alike to all cities except on message from the Governor declaring that an emergency exists and the concurrent action of two-thirds of the members of each house of the Legislature.

" § 3. Every city shall have power to adopt and amend local laws not inconsistent with the Constitution and laws of the State, relating to the powers, duties, qualifications, number, mode of selection and removal, terms of office and compensation of all officers and employees of the city, the transaction of its business, the incurring of its obligations, the presentation, ascertainment and discharge

of claims against it, the acquisition, care, management and use of its streets and property, the wages or salaries, the hours of work or labor, and the protection, welfare and safety of persons employed by any contractor or subcontractor performing work, labor or services for it, and the government and regulation of the conduct of its inhabitants and the protection of their property, safety and health. The Legislature shall, at its next session after this section shall become part of the Constitution, provide by general law for carrying into effect the provisions of this section.

" § 4. The provisions of this article shall not be deemed to restrict the power of the Legislature to enact laws relating to matters other than the property, affairs or government of cities.

" § 5. The Legislature may by general laws confer on cities such further powers of local legislation and administration as it may, from time to time, deem expedient.

" § 6. All elections of city officers, including supervisors and judicial officers of inferior local courts, elected in any city or part of a city, and of county officers elected in the counties of New York and Kings, and in all counties whose boundaries are the same as those of a city, except to fill vacancies, shall be held on the Tuesday succeeding the first Monday in November in an odd-numbered year, and the term of every such officer shall expire at the end of an odd-numbered year. The terms of office of all such officers elected before the first day of January, one thousand eight hundred and ninety five, whose successors have not then been elected, which under existing laws would expire with an even-numbered year, or in an odd-numbered year and before the end thereof, are extended to and including the last day of December next following the time when such terms would otherwise expire; the terms of office of all such officers, which under existing laws would expire in an even-numbered year, and before the end thereof, are abridged so as to expire at the end of

the preceding year. This section shall not apply to elections of any judicial officer, except judges and justices of inferior local courts.

" § 7. The provisions of this article shall not affect any existing provision of law; but all existing charters and other laws shall continue in force until repealed, amended, modified or superseded in accordance with the provisions of this article. Nothing in this article contained shall apply to or affect the maintenance, support, or administration of the public school systems in the several cities of the State, as required ·or provided by article nine of the constitution."

The Appellate Division has held that this amendment is abortive because between the session of the Legislature held in 1922 and the session held in 1923, article XII of the Constitution had been changed by incorporating a direction that special city bills be transmitted to the clerk, with the result that the article upon which the amendment was to operate was not the same when the resolution was adopted by the Legislature of 1923 as it was when the same resolution had been adopted in 1922. But while the article upon which the amendment was to operate was not the same in the two years, the amendment itself, the new or substituted article, was the same to the last syllable and comma. The resolution proposed by the Legislature of 1922 is identical with the one repassed by the Legislature of 1923 and thereafter approved by the electors. To nullify it we must imply a limitation upon the power of the electors where none has been expressed. The Constitution has said that two Legislatures shall accept an amendment before approval or ratification by the people, and this command has been obeyed. The Appellate Division has supplemented the command by reading into it an implied condition that the article displaced or superseded shall remain unvaried in the interval. We find neither precedent nor adequately persuasive reason to support the implication.

There is little room for misapprehension as to the ends to be achieved by the safeguards surrounding the process of amendment.   The integrity of the basic law is to be preserved against hasty or ill-considered changes, the fruit of ignorance or passion.   The amendment must be approved by a majority of the members in each house of the Legislature, and, after being referred to a new Legislature, must be published during a prescribed term for the information of the voters.   The members of both houses must have been elected after such publication, for the voters are to have an opportunity to ascertain the views of their representatives as to any change proposed, and to regulate their choice accordingly.   Senators are elected in even years; Assemblymen are elected annually. For that reason the amendment is to be referred   " to the legislature to be chosen at the next general election of senators."   The members of each house are to know the will of their constituents.

In the revision of article XII all these commandments have been complied with to the letter.   We see no basis for the holding that adherence to the letter has been accompanied by departure from the spirit.   The Legislature of 1922 understood what it was proposing and the effect of its proposal when it repassed the trifling procedural amendment initiated by the Legislature of 1920, and at the same time initiated a new and more comprehensive amendment of the same article to be referred to the Legislature of 1923.   It said in effect: " This change is an improvement, and should be adopted now, but we have a plan for something better, superseding the present system altogether, which under the provisions of our Constitution must be referred to our successors."   The Legislature of 1923 to which the plan was thus referred did not pass upon a different plan, because the article to be superseded had been amended in the interval, but, with knowledge of the amendment, resolved, like the Legislature before it, that the superseding plan was

better.   The identity of a law, whether it be a Constitution or a statute, is to be gathered from its terms, and does not vary with the variations of the law that it displaces.   As there was nothing in the situation misleading to the Legislature, so also there was nothing in it misleading to the voters.   They accepted the procedural amendment submitted for their approval, and chose at the same time another Legislature with a mandate to act upon the comprehensive amendment of which notice had been given.   If the ruling of the Appellate Division were to be upheld, the conclusion would follow that the electors were confronted with the alternative either of refusing approval of the procedural amendment, which cleared up a baffling uncertainty in their existing Constitution, or of nullifying whatever action had been taken by their representatives with a view to the adoption of a complete revision in the future.   We see no reason for forcing that alternative upon them.   An elector, voting in 1922, could not be sure whether the Legislature of 1923 would approve or reject the amendment referred to it.   Even though the Legislature should approve, he could not foretell how the amendment would thereafter be dealt with by the people.   If he was a sensible man, he must have said to himself that he would accept the good that was at hand, and leave the future to say whether he was to get the good that was remote.   The last thing he would have been likely to imagine is that in accepting the one, he was nullifying the other.

The introductory words of article XIV are stressed by the Appellate Division and in the arguments of counsel. It is an amendment or amendments to " this " Constitution that may be proposed in Senate or Assembly.   We are told that " this " Constitution during the session of 1923 was not the same as " this " Constitution during the session of 1922.   A new entity had come into being. Amendment, if made, would be amendment of " this " entity and not an amendment of the old one.   For that

reason, the process of amendment, it is said, must be gone over again from the beginning. Such niceties of verbal criticism do not help to determine the meaning of a great instrument of government. " It is a constitution we are expounding " (MARSHALL, Ch. J., in *Mc-Culloch* v. *Maryland*, 4 Wheat. 316). A Constitution has an organic life in such a sense, and to such a degree, that changes here and there do not sever its identity. " This " book is one, though in its later editions words or phrases have been added, just as " this " body is one though its members may have grown. The argument to the contrary may be tested by its consequences. A proposal made by one Legislature for final action by another is nullified, we are told, when there is intermediate amendment by the voters of the same article or section. If that is so, a like result must follow from the change of any other section. The Constitution ceases to be " this " Constitution in the one case as in the other. Article XII as revised was an amendment of article XII as framed by the Constitutional Convention, but it was also something more. It was an amendment of other articles in that it supplemented or modified or affected their provisions. For illustration, the new provision that special laws affecting the property, affairs or government of cities may be adopted only upon an emergency message by the Governor and upon the concurrent action of two-thirds of the members of each house is a modification in effect of sections 1 and 18 of article III, which lodge the legislative power in the Senate and the Assembly, and enumerate the instances in which local statutes are forbidden. The identity of a Constitution is not dependent upon its division by paragraphs or numerals; and a change in any part may have an effect upon the whole, and certainly upon many other articles than the one in which the change has been embodied. To hold that amendment of any article, no matter how remote in place or subject-matter, nullifies every proposal for the amend-

ment of any other is to press the argument for nullification to a *reductio ad absurdum.* To stop short of this and to condition the effect upon logical relations or a calculation of the consequences is to involve the process of amendment in a tangle of uncertainties.

Impressive words of counsel remind us of our duty to maintain the integrity of constitutional government by adhering to the limitations laid by the sovereign people upon the expression of its will. We have no thought to disregard them. Not less imperative, however, is our duty to refuse to magnify their scope by resort to subtle implication. When an article of the Constitution has been ratified by popular vote after acceptance by two Legislatures, separately chosen, the courts would be discrediting constitutional government rather than supporting it if they were to hold that limitations read into the text of the Constitution by dubious construction could nullify the mandate of the people and the people's representatives. Repeated decisions have informed us that only when conflict with the Constitution is clear and indisputable will a statute be condemned as void. Still more obvious is the duty of caution and moderation when the act to be reviewed is not an act of ordinary legislation, but an act of the great constituent power which has made Constitutions and hereafter may unmake them. Narrow at such times are the bounds of legitimate implication. If the duty of circumspection has need of other emphasis, we may find it in the consequences. In reliance upon this amendment, acts of the Legislature have been passed without submission to the mayors of cities, when such submission would be necessary if the article unamended were to be held in force to day. The brief of the Home Rule Commission informs us that there were fifteen such acts in 1924, and more than a score in 1925. In like reliance, about 200 local laws have been passed, it is said, by 38 cities. To set them aside will mean that salaries, terms of office, elections, city expendi-

tures, local improvements and a host of other subjects will be disarranged and thrown into confusion. There must be submission to these evils if in truth and in matter of substance the Constitution has been violated. We will not strain and subtilize in order to invite them.

The objection is urged that there was a departure from article XIV of the Constitution in yet another particular. The proposed amendments, it is said, were not entered as required by that article upon the journals of the houses. We do not need to consider whether the provisions of the Constitution in that respect are directory or mandatory. If we assume them to be mandatory, they were sufficiently obeyed. The amendments, though not entered at large, were entered by their title. This was done upon every reading with a record of the ayes and noes. The Constitution does not say how or at what length the entry shall be made. Any entry identifying with reasonable certainty the subject-matter of the vote and in accord with legislative practice should, therefore, be sufficient. Entry by the title did reasonably identify the subject of the vote, and was in accord with legislative practice. A large number of the amendments for nearly a century back would be nullified by a ruling that there must be entry in full upon the journal of each house. This is true, for example, of the amendment authorizing the adoption of a law for workmen's compensation, the soldiers' bonus amendment, the amendment for the relief of absent voters, and the amendment conferring the suffrage upon women. The records justify the statement that entry in full and entry by the title have been resorted to indifferently, and the two treated as equivalents. In matters such as these, which touch the mere mechanics of lawmaking, the practice of the lawmakers, if not clearly unreasonable, may well be treated as decisive. A different conclusion might conceivably be necessary if the content of legislation, whether embodied in a statute or

8

in a concurrent resolution, were commonly established by reference to the journal. It is not. The content of legislation of this order is fixed by the certificates of the presiding officers of the two houses, which are appended to the resolution, and deposited under the command of the statute with the Secretary of State. There is even authority for a holding that reference to the journal is not permitted to impeach them (Legislative Law, § 40; cf. *Field* v. *Clark,* 143 U. S. 649, 672, 680; *People* v. *Supervisors of Chenango Co.,* 8 N. Y. 317; *People* v. *Devlin,* 33 N. Y. 269, 283; *People ex rel. Purdy* v. *Comrs. of Highways of Marlborough,* 54 N. Y. 276). From all this it appears that the office of the entry is adequately served when there is an entry of the title. The cases in other jurisdictions are conflicting. A particularly enlightening discussion will be found in the opinion of WINSLOW, Ch. J., in *State ex rel. Postel* v. *Marcus* (160 Wis. 354, at pp. 380, 381, 382). We think the weight of argument accords with our conclusion (*State ex rel. Postel* v. *Marcus, supra; Oakland Paving Co.* v. *Tompkins,* 72 Cal. 5; *Worman* v. *Hagan,* 78 Md. 152; *Nesbit* v. *People,* 19 Colo. 441; *Prohibitory Amendment Cases,* 24 Kans. 700).

(2) From the question of constitutional validity, we pass to the second phase of these appeals, the question of construction.

The Legislature in framing the City Home Rule Law (Consol. Laws, ch. 76; L. 1924, ch. 363) has adhered closely to the form of the constitutional amendment. It has said (§ 11) that " the local legislative body of a city shall have power to adopt and amend local laws in relation to the property, affairs or government of the city relating to the powers, duties, qualifications, number, mode of selection and removal, terms of office and compensation of all officers and employees of the city, the transaction of its business, the incurring of its obligations, the presentation, ascertainment and discharge of claims against it, the acquisition, care, management and use of its streets

and property, the wages or salaries, the hours of work or labor, and the protection, welfare and safety of persons employed by any contractor or subcontractor performing work, labor or services for it, the government and regulation of the conduct of its inhabitants and the protection of their property, safety and health." It has said (§ 12) that " any local law adopted pursuant to this chapter may specify any provision of an act of the Legislature  *  *  * which provision relates to the subject matter of such local law and does not in terms and in effect apply alike to all cities, and which it is intended to supersede by such local law; and upon the taking effect of such local law, such provision of any such act of the Legislature so specified shall cease to have any force or effect in such city." This is coupled with the restriction that " no local law shall supersede any provision of an act of the Legislature relating to the property, affairs or government of cities which provision in terms and in effect applies alike to all cities," nor " any provision of an act of the Legislature which provision relates to matters other than the property, affairs or government of cities," nor provisions enacted on an emergency message by the Governor and by the concurrent action of two-thirds of the members of each house. Another section (§ 15) makes provision for a mandatory referendum to the electors of the city if the local law covers certain enumerated subjects, or provides a new charter. By section 20, a new charter, if proposed, " may contain such provisions or effect such results as may be made or effected by local law under provisions of this chapter," but no others. Finally (§ 21), there are subjects that are withdrawn altogether from the action of the local legislative body in the fear that they might be thought to come within the description of local laws as given in section 11 unless specially excluded. Among these, for illustration, are restrictions upon the limit of indebtedness or upon the issuing of bonds or other evidences of debt; the administration of

the city educational system; and changes in the Tenement House Law, the Labor Law or the Workmen's Compensation Law.

Acting under the authority of this statute, or professing so to act, the city of New York (in disregard of the advice of its corporation counsel) adopted in 1925 four local laws, Numbers 3, 4, 5 and 6.

Local Law 3 amends section 242 of the Greater New York Charter by conferring power upon the board of estimate and apportionment " to establish a route or routes for the operation of municipal buses " upon the streets and other public places of the city of New York, and to prescribe the conditions of operation, the rates of fare, and the character of service.

Local Law 4 amends the Greater New York Charter by inserting a new section, 595-a, placing the operation and maintenance of the municipal buses under the charge of the commissioner of plants and structures.

Local Law 5 amends section 1458 of the Greater New York Charter by excepting from its provisions routes " operated or to be operated by any department of the city of New York under authorization of the board of estimate and apportionment."

Local Law 6 amends section 24 of the Transportation Corporations Law by modifying the definition of the persons and corporations that shall be subject thereto.

The city of New York by the adoption of these local laws has claimed for itself the power under the amended Constitution and the City Home Rule Law to enter upon the business of a common carrier, to acquire municipal buses and itself maintain and operate them. There is before us no question of its power to perfect the creation of a franchise whereby such routes may be maintained by individuals or corporations willing to make payment for the privilege. The machinery for that is ample and readily available. The question is one of the power of the city to do the business for itself.

We have held, and it is settled law, that until the adoption of the City Home Rule Law, such power had not been conferred upon the city of New York by the Greater New York Charter or by any other statute (*Brooklyn City R. R. Co.* v. *Whalen,* 191 App. Div. 737; 229 N. Y. 570; *Schafer* v. *City of New York,* 206 App. Div. 747; leave to appeal denied by this court, July 15, 1923; *Huff* v. *City of New York,* 202 App. Div. 425; *Kingsbridge Ry. Co.* v. *City of New York,* 204 App. Div. 369). We were not unmindful of the broad provision of the General City Law (Consol. Laws, ch. 21; L. 1913, ch. 247, § 20, subd. 16; *Schieffelin* v. *Hylan,* 236 N. Y. 254) whereby cities were empowered to establish such instrumentalities as they might deem appropriate for the welfare of their inhabitants. We held, however, that this provision, contained as it was in a law applicable to cities generally, must be read in subordination to exceptions and limitations made applicable to particular cities by the terms of their own charters. Reading the charter of the city of New York, and following the course of cognate legislation, we found tokens of intention sufficient to require the conclusion that the Legislature had denied to the city the power to enter for itself upon the business of municipal transportation. The scheme of the charter, as we viewed it, postulated the grant of a franchise as a primary condition, and was framed on the assumption that there would be operation by the grantee, subject to regulation at all times by the power of the State (*Matter of McAneny* v. *Board of Estimate, etc., of N. Y.,* 232 N. Y. 377; *Admiral Realty Co.* v. *City of New York,* 206 N. Y. 110). True, the city was at liberty (Greater New York Charter, § 73) when the franchise should expire to take possession of the plant and thereafter run the business as its own. Even this power, however, was not taken for granted, so to speak, but was expressly conceded lest perhaps it should be denied. The distinction, of course, is obvious between a power of recaption, whereby a plant acquired and paid

for by the holder of the franchise may be appropriated for the benefit of the public after its utility has been demonstrated, and a general power to engage as an original project in the business of transportation, and to venture the public moneys without supervision or restriction. The holder of the franchise would be subject to the provisions of section 53 of the Public Service Commissions Law (Consol. Laws, ch. 48) and sections 24 and 25 of the Transportation Corporations Law (Consol. Laws, ch. 63). Certificates by the Public Service Commission of public convenience and necessity would be conditions precedent without which the franchise would be invalid, and thereafter the regulatory power of the Commission would be exercised in other ways (see, *e. g.,* Public Service Commissions Law, § 55). If the stage of operation under a franchise could be jumped over, and municipal operation begun at once, the city would escape by indirection the limitations laid upon its action by the power of the State. In effect, a local law or resolution would thus set aside a general law, for section 53 of the Public Service Commissions Law and sections 24 and 25 of the Transportation Corporations Law are general, applying, as they do, to all cities of the State alike. Not even under the City Home Rule Law of 1924 may such a general law be set aside by a law of the locality (City Home Rule Law, § 12). In the previous state of the law, the lack of power was even plainer. There was need, therefore, of express authority to enable the city of New York to carry passengers upon its streets. Express authority had also been found necessary to furnish cars upon the city bridges. Nor was this all. We found in section 1458 of the charter a provision specially applicable to bus lines which pointed to the same conclusion and even more distinctly. By that section, no stage or omnibus route was to be put in operation upon any street or public ground within the city of New York unless a franchise had been granted. There were other indicia

of intention which it would be without profit to recall. Municipal operation was excluded at every turn.

We start, then, with the premise that at the time of the adoption of the City Home Rule Law, the city of New York was without power under its charter to lay out a route for buses and thereafter engage in the business of a common carrier of passengers; and the question is whether by anything contained in that law the privilege is given it to confer that power upon itself. The title of the act must be classed as a misnomer if it has given currency to the belief that cities have been emancipated from the power of the Legislature in respect of every legitimate subject of local interest or concern. Nothing of the kind has been accomplished or attempted. There are Constitutions in some of the States whereby cities are empowered in general terms to frame their own governments. When that authority is conferred, there is no restriction upon the power of the local legislative body, except the implied one that what is embodied in the charter must have some appropriate relation to cities and their government. Transportation is a city purpose (*Sun Printing & Pub. Assn.* v. *Mayor, etc., of N. Y.,* 152 N. Y. 257). It follows that where the power of local government is general, cities may own and operate their own lines of transportation (*Platt* v. *City of San Francisco,* 158 Cal. 74; *City of Pasadena* v. *R. R. Comm.,* 183 Cal. 526; *Denver* v. *Hallett,* 34 Colo. 393; McBain, New York Proposal for Municipal Home Rule, 37 Pol. Science Quarterly, 655, 674). But neither the Constitution of New York nor the City Home Rule Law confers these blanket powers upon the cities of this State. The local laws must touch a city in its property, affairs or government, but this alone will not support them. There is yet another restriction. They must touch the city's property, affairs or government in one or more of certain enumerated ways, *i. e.,* by " relating " (1) " to the powers, duties, qualifications, number, mode of selection and removal, ·terms of

office " or " compensation " of " officers and employees of the city," or (2) " the transaction of its business, the incurring of its obligations," or " the presentation, ascertainment and discharge of claims against it," or (3) " the acquisition, care, management and use of its streets and property," or (4) " the wages, salaries, hours of labor, etc., of employees of its contractors and subcontractors," or (5) " the government and regulation of the conduct of its inhabitants and the protection of their property, safety and health." The power asserted by the city must fall, if it exists at all, under subdivisions (1), (3) or (5). We proceed, therefore, to consider whether any of these subdivisions is adequate to sustain it.

a. The attempted amendment of the charter relates to something more than " the powers, duties, qualifications, number, mode of selection and removal, terms of office " or " compensation " of " officers and employees of the city." It is an enlargement of the powers of the city itself. Thoughtful students of municipal government discern in municipal charters provisions of a threefold order. Under one head fall those provisions that create the municipality and fix its territorial limits. Under a second head fall those provisions that determine corporate powers by defining the things that the municipality is competent to do. Under a third head fall those provisions that declare the manner in which the functions thus established shall be discharged, and the competence and tenure of the officers and employees chosen to discharge them. The classification points the way to a solution of our problem. Under the City Home Rule Law, or at least this subdivision of it, the subjects to be governed by local laws fall chiefly, even if not invariably, within the third of the three groups. The line of division between the second class and the third will at times be hard to draw, for the two classes shade into each other. As specific problems arise, we shall have to deal with them as best we can. In a general way, however, the distinc-

tion is apparent. It is analogous to the distinction, which has become a familiar one in the law of private corporations, between the powers and functions of the corporation as determined by the charter or the certificate of incorporation, and the powers and functions of the officers and agents by whom the business is transacted. Under the Home Rule Law, the city may redistribute its powers among its officers and employees. For the better execution of those powers, it may at times create instrumentalities that have been theretofore unknown. It may not transform its own powers under the guise of an amendment of the powers of its agents. If changes of that order were in view, there was no need of going on with the enumeration of other subjects that might be regulated by local laws. Every conceivable subject of municipal government had already been brought within the range of local regulation if authority to change the powers and functions of municipal officers and employees is authority to change without limit the powers and functions of the municipality itself. The enumeration of subjects in that view would have stopped right there. Instead, it went on, and included many minor matters, quite vainly and misleadingly if an all-inclusive clause had covered them already. Their presence is an implied disclaimer of pretensions so imposing. Under the previously existing law, the city did not have the power on its own motion and at its own pleasure to engage in business for itself as a common carrier of passengers. As we have shown, the power was withheld not only by charter provisions (*e. g.*, § 1458), but also by laws applicable without discrimination in that respect to all the cities of the State (Public Service Commissions Law, § 53; Transportation Corporations Law, §§ 24, 25). The Legislature may remove these limitations and confer upon the municipality a larger measure of authority (Constitution, art. XII, § 5), but until it does so, the limitations must be followed without circumvention or evasion. Authority

to disregard them and in so doing to' set at naught the restraint of general laws may not be gathered from authority to regulate the tenure, the powers and the duties of officers and employees.

This conclusion, if it might otherwise be doubtful, is confirmed when the Constitution and the statute are read in the setting of their history. Our decision in *Brooklyn City R. R. Co.* v. *Whalen* (229 N. Y. 570), which held that the city was without power to operate omnibus and stage routes, was made in 1920. In that year and annually thereafter the Legislature has had before it bills for the amendment of the charter by conferring authority to establish a municipal bus line. In every instance the bills have failed. The Legislatures of 1922 and 1923, which adopted the resolutions for the amendment of article XII, and the Legislature of 1924, which passed the City Home Rule Law, refused their assent to such bills like the Legislatures before and after. It is hardly conceivable that they would have persisted in that refusal if they intended all the time that the power should exist. Either they would have passed the special laws or reframed the resolutions or the general law. They would have said in so many words that the city might establish its own public utilities and operate them itself. They would not have cloaked their meaning under a general grant of power to modify the powers and duties of officers and employees. No doubt, the controlling consideration in fixing the meaning of a constitutional amendment and of a statute which repeats it is the intention of the electors, but the electors may be presumed to be acquainted with the notorious facts of current legislative history. It is significant that counsel for the appellants do not rest their argument in any degree upon this provision of the statute. They are apparently at one with us in the belief that the city's power, if it exists, must find a firmer basis.

b. The attempted amendment of the charter of the city relates to something more than " the acquisition, care, management and use of its streets and property." The city's disability in respect of the maintenance of bus lines did not have its origin in the circumstance that such maintenance would involve a use of the city streets, or at all events did not have its origin in that circumstance alone.   As we have already shown, the disability was due even more distinctly to the fact that the city had been denied the general power to carry on the business of a common carrier of passengers.   The difficulty has not been removed, therefore, by permitting it to regulate the use of streets.   The deeper difficulty remains that it may not be a carrier itself.   If the route were to be over private property, and not upon the streets at all, or if it were even in the upper air, the city would even then be hampered by the denial of power to embark upon the venture.   In such circumstances, there is no occasion to consider to what extent, if at all, this subdivision of the statute has affected the power of the city where the use of the streets is incidental to the enjoyment of a franchise by another. Our rulings in *Admiral Realty Co.* v. *City of New York* (206 N. Y. 110) and *Matter of McAneny* v. *Board of Estimate, etc., of N. Y.* (232 N. Y. 377) are invoked by the respondents to limit, even in those conditions, the range of local laws.   That   question is not here.   It is enough that the city is without power to maintain the line itself.   Again the setting of history, of legislative action and inaction, reinforces our conclusion.

If the act of 1924 (The City Home Rule Law) was framed in the belief that cities would have the power thereafter to become common carriers of passengers, its provisions are more significant for what they omit than for what they contain.   The subject of municipal transportation had long agitated the public mind, and never more than then.   We have seen that as the result of

injunctions against the operation of municipal bus lines which had been granted by the courts, repeated applications had been made to the Legislature in behalf of the city of New York to enlarge the city's power and that all bills directed to that end had been rejected. We are now told that the same Legislature was granting with one hand what it was withholding with the other. The indefinite statement that cities might regulate the acquisition, care, management and use of their streets and property, neutralized, it is said, the failure to make explicit grant of the power so clamorously demanded and steadily refused. A decent respect for a co-ordinate department of the government forbids the judiciary to assume that the lawmakers, intending to confer the power, would have so mystified the grant. In this State, even if not elsewhere, municipal transportation upon a scale so extensive without supervision or restriction is a notable innovation. The colorless words chosen were singularly inept if they were intended to express approval of a departure so momentous. We cannot reasonably invest them with this meaning when they may be given a legitimate function within the range of established and familar powers. A phrase so unobstrusive, so commonplace in the vocabulary of Legislatures, so freighted with other traditions, with other associations and suggestions, will not bear so great a burden. Charters, almost without number, have confided to local legislative bodies an ordinance power which embraces the regulation of the use of streets, if not in so many words, at least in words substantially equivalent. We assume for present purposes, though without intending to decide, that by force of such a grant there is power to regulate the burdens to which the streets shall be subjected, as unquestionably there is power to place reasonable regulations upon traffic, its methods, forms or hours. Only recently we sustained a statute whereby a municipality was given power to license the erection of gasoline

pumps along the curbs of streets for the convenience of its travelers (*Matter of McCoy* v. *Apgar*, 241 N. Y. 71). Many other instances of the enlargement of street uses or their restriction will readily suggest themselves. A wide gap intervenes between the power of a municipality to determine the extent to which others may do business in its streets, and the power, hitherto ungranted, to do business for itself.

c. The subdivision which we have designated (5) does not call for extended comment. There was no thought in enacting it that it would be made to bear the burden of a system of transportation, to be paid for with public moneys and maintained by public officers. These are not health laws within any fair interpretation. Again the argument is persuasive that implication so extensive is illegitimate when there was demand as well as opportunity for unequivocal expression.

The Home Rule article of the Constitution and the statute passed under its authority have a field of operation, narrower than some of the friends of the principle of home rule would favor, but still significant and important. Innumerable matters of detail that affect the fortunes of municipalities,— the salaries of officers, the cost of necessary improvements, the methods and agencies and instruments for the attainment of corporate ends,— these things and many others may be regulated to-day by the municipalities themselves. We make no attempt to mark the limits with precision. That task is for the future.

To recapitulate, we hold:

1. That the amendment of article XII of the Constitution (the so-called Home Rule article) was regular and valid, and that said article became on January 1, 1924, and now is, a part of the Constitution of the State.

2. That under the authority of that article the City Home Rule Law (Consol. Laws, ch. 76; L. 1924, ch. 363) was legally enacted.

3. That neither the said article nor the said law empowers the city of New York in the circumstances exhibited by this record to carry on the business of a common carrier of passengers.

The order in each case should be affirmed with costs, and the question certified answered in the affirmative.

HISCOCK, Ch. J., POUND, MCLAUGHLIN, ANDREWS and LEHMAN, JJ., concur; CRANE, J., concurs in memorandum, as follows:

CRANE, J. (concurring). For the following reason I agree that article XII of the Constitution was legally amended. Every step required to be taken to amend the Constitution was followed in this instance. So far as the Constitution states, its mandate was followed; nothing was omitted. In order to attack the validity of this amendment, counsel have been obliged to read into section 1 of article XIV something which is not there — they call it " the manifest purpose " of section 1 of article XIV of the Constitution. The purpose can best be read in and must be confined to the exact words used. When the people place limitations upon their power to modify the Constitution, those limitations cannot be extended by what others may think or believe to be a purpose. Purpose or no purpose, the way to amend is pointed out; that way must be followed, and when followed is sufficient. Whatever may be the result, or however confusing or perplexing, or even useless may be the consequences, the Constitution becomes the will of the people when it is adopted by their vote in the method provided.

Because another amendment to article XII, section 2, became effective January 1, 1923, between the time in 1922 when the first resolution for the amendment in question was passed, and January, 1923, when the second resolution was passed, the court below has found that the

1925.]          Memorandum, per CRANE, J.          [241 N. Y. 96]

purpose of article XIV has not been complied with. Even if the arguments put forth to sustain this position had force, the fact remains that there is nothing whatever in the Constitution regarding such a situation, no mention made of such a contingency. Article XIV provides for amendment by proposed resolution adopted by two Legislatures and by the vote of the people. It does not say that the amendment fails if any other amendments shall be adopted after the act of the first Legislature and before the vote of the people. Why should the courts add what the Constitution has omitted? It is just as objectionable and dangerous to require more to be done to amend the Constitution than the law provides, as it is to omit any essential step.

I also agree that this amendment to the Constitution, and the Home Rule Law adopted under it, did not give to cities and the city of New York the right to operate bus lines. However, I place my conclusions solely upon the ground that sections 24 and 25 of the Transportation Corporations Law apply to all cities generally, and cannot be modified or superseded by local city laws. The Public Service Commissions Law is made applicable to bus lines — common carriers — and a certificate of necessity or convenience for the public service must be obtained. For myself, I reserve the question whether the city, having applied for and obtained such a certificate, may not operate a bus line.

Orders affirmed.