Max Bloom, J.
This is an action seeking a permanent injunction and damages by reason of acts alleged to have been committed by defendant, its agents, officers, members and persons acting in concert with it. The claim for damages was withdrawn at the close of plaintiff’s case upon the ground that it could not be established that defendant was responsible therefor.
*824 Plaintiff (AFA) is a domestic corporation engaged in installing and servicing fire and burglary alarm systems. For a number of years prior to February 7, 1972, AFA and the defendant union had been in collective agreement. The last such agreement had been entered into on February 7, 1969 and covered the employees in the unit defined in that agreement. Under its terms, the agreement was terminable on any anniversary date on or after February 7, 1972, provided that either party gave at least 90 days ’ written notice to the other of an intent to terminate. It is undisputed that such notice was given to AFA by the union.
Thereafter, on December 21, 1971, the parties met in their first bargaining session looking to a new labor agreement. At the meeting the union submitted its list of demands. Between December 21, 1971 and January 21, 1972, the parties met on five separate occasions. Apparently the negotiations never moved off center, for AFA offered only one of two alternatives — either a one-year renewal with no changes or a three-year agreement with unspecified economic improvements during the second and third years. Actually, the offer of a one-year renewal with no changes contemplated a potential downgrading of then existing economic benefits, for it included a proviso that any increase in the cost of hospital and medical insurance was to be borne by the employees.
Inasmuch as the five sessions between the parties had left them locked in precisely the same positions from which they had started, the union sought and obtained the intervention of the State Mediation Board. Mediation meetings were held on January 31, 1972 and February 3, 1972. Movement was minimal and a further mediation session was scheduled for February 4. On the morning of February 4, approximately 90 employees on the day shift called in sick. These employees were discharged immediately. Thereupon the AFA representatives refused to participate in the scheduled mediation session. Later that day, when it became apparent that the second shift had reported for work, AFA consented to a mediation session on February 5. Although there was some slight movement in the position of the parties on that day, no agreement was reached. No mediation session was held on the 6th, a Sunday, and at 12:01 a.m. on February 7 the union struck.
It is against this background that the incidents giving rise to this action occurred. These incidents fall into three categories. The first involved the picketing of plaintiff’s place of business. The second is concerned with individual acts allegedly directed against specific nonstriking employees. The final category in *825 volves two sit-ins claimed to have been conducted by members of the union.
I
At the very outset the union moved to dismiss the complaint for lack of jurisdiction. It is conceded that AFA is engaged in interstate commerce. Indeed, at the time of the trial of this action each of the parties had charged the other with unfair labor practices before the National Labor Relations Board. In Peltsman v. American Radio Assn. (69 Misc 2d 17), I had occasion to collate and review the authorities governing the doctrine of federalism in labor relations. I there pointed out that when a controversy falls, arguably, under the broad umbrella of either section 7 or 8 of the National Labor Relations Act, as amended (U. S. Code, tit. 29, §§ 157 and 158), State courts are divested of jurisdiction unless the conduct complained of imperils the public peace or the Labor Relations Act expressly confers jurisdiction upon the State courts, as it does under subdivision (b) of section 14 of the act (U. S. Code, tit. 29, § 164, subd. [b]). Accordingly, it is in the context of the law, as thus interpreted, ¡that the incidents complained of must be judged.

II

The picketing by the union of the building where AFA has its place of business was conducted by a line consisting of from 1 to 30 people. It has been under the supervision of the police and according to police testimony, has been orderly. Except when police manpower needs required otherwise, one officer was assigned during the 8 to 4 shift and two the 4 to midnight shift. Only one complaint was received by the police with respect to the picketing. That came from a shopkeeper who operated a store in the same building as AFA maintained its offices. His complaint was predicated upon the claim that the line overflowed in front of his store. As a result, the line was compacted so that there was no potential interference with the shopkeeper’s business.
Certainly, this conduct was not of such a nature as to itself spell out activity which removes this case from the ambit of the doctrine of Federal pre-emption (Garner v. Teamsters Union, 346 U. S. 485; Weber v. Anheuser-Busch, 348 U. S. 468; San Diego Unions Council v. Garmon, 353 U. S. 26; San Diego Unions Council v. Garmon, 359 U. S. 236). Thus, cases like Teamsters Union v. Vogt, Inc. (354 U. S. 284), Hughes v. Superior Ct. (339 U. S. 460), Teamsters Union v. Hanke (339 U. S. 470) and Build-
*826 ing Serv. Unions v. Gazzam (339 U. S. 532), which substantially emasculate Thornhill v. Alabama (310 U. S. 88) have no application.
Ill
The second category of incidents involves individual claims of harassment. Bruce Thomason, the son of the president of AFA and an employee of one of its subsidiaries who had been assigned to do repair work for AFA during the course of the strike, testified that on February 8, 1972 he had been cuffed around by two persons, one of whom he identified as a striker. Subsequently, he made complaint to the police but refused to charge the identified striker with any penal violation. In connection with this incident it is important only to take note of the testimony of the corroborating witness. He testified, in great detail, that the striker who is claimed to have participated in pushing Thomason around ‘‘ drew out a hunting knife and put it against the underside of Bruce’s throat in a harassing manner.” He went on to describe the knife as having “ a blade five or six inches long with a shark’s-tooth type blade ’ ’ and having ‘ ‘ a very fancy handguard on it and a black handle. ’ ’ In light of Thomason’s statement that he never saw any weapon and made no mention of a weapon in his complaint to the police, the corroborating testimony is entitled to no credence.
The second individual claim involves two female employees . of AFA who testified that on March 29 eggs were thrown at them by a striker who was a member of the union’s negotiating committee. Charges of harassment were filed in the Criminal Court against the striker. That case resulted in a dismissal of the charges.
On April 13 there were three separate incidents. In one, some unknown person is alleged to have kicked at a puddle in the street, splattering an executive of AFA with water. In the second, two clerical workers are claimed to have been pushed as they proceeded through the lobby of the building. The final incident was a claim by a nonstriker that he was ‘ ‘ harassed ’ ’ by an unkown person.
The next incident occurred on May 1, and involved a charge of harassment by a nonstriker against one John Vogt, a member of the union. It is contended that criminal charges were filed against Vogt but that no endeavor was ever made by the police to apprehend him despite his availability. The culminating incident occurred the following day and involved a claim of harassment by one who had been employed as one of the replacements for the striking workers.
*827 These seven complaints comprise the sum total of the specific claims of violence attributable to the strike. One resulted in a criminal charge which was dismissed.. At least one other complainant refused to press charges. In the remaining instances, except one, there is no proof that anyone connected with the union bore any responsibility. That one exception seems to defy understanding.
Even if complete credence were given to AFA’s presentation of these claims — and it is obvious that they have been puffed all out of proportion for the purposes of this action — they represent no more than the normal give and take in a situation charged with emotion. In a somewhat similar situation it was held that ‘ ‘ The few scattered events relied on by the plaintiff fail completely to establish that the defendants instigated or encouraged coercive or illegal conduct. No serious acts of violence occurred and the threats which were alleged to have been made on two occasions, and which I find were uttered, were the unrelated actions of over-zealous members of the defendant union. The single incident which might be considered as an act of physical force is an eventlsolated and disconnected from the over-all picture of peaceful, honest and orderly picketing which was presented upon the trial. I find that there is not here the fraud, the ‘ background ’ and ‘ context of violence ’, or the likelihood of future violence which are required for the issuance of an injunction to restrain picketing ” (Carl Ahlers, Inc. v. Papa, 65 N. Y. S. 2d 867, 869, affd. 272 App. Div. 905; see, also, Kraus & Bros. v. Bergman, 2 N Y 2d 155).
The conclusion that the incidents complained of were sporadic and isolated is fortified by a determination of the National Labor Relations Board, Second Region, which was rendered subsequent to the trial'of this action. As indicated, each of the parties had filed charges against the other with the Labor Board. The charges filed by AFA embodied the substance of the matters here in controversy. At the time of trial these charges were still in the process of investigation. On July 12, the Acting Regional Director for the Second Region, having completed that investigation, notified AFA of his refusal to direct the issuance of a complaint against the union, pointing out, among other things, that the claim of violence “ is insubstantial and in the circumstances of this case, does not warrant further .action.” This ruling by a public agency may be judicially noticed (Matter of Sunhill Water Corp. v. Water Resources Comm., 32 A D 2d 1006,1008; Browne v. City of New York, 213 App. Div. 206, 233, affd. 241 N. Y. 96). Hence, these incidents form no nexus upon which may be predicated a claim of State jurisdiction.
*828 IV
AFA’s final claim is bottomed upon two sit-ins, the first occurring on March 9 and the second on April 13. On March ,9 approximately 40 to 50 people occupied the lobby or reception area of AFA’s fourth floor premises. Although those who sat in were referred to as former employees of AFA, none of plaintiff’s witnesses could name a single demonstrator. The sit-ins remained in the lobby for some 30 minutes. When the police arrived, the demonstrators left.
The sit-in of April 13 was larger in size, involving approximately 90 to 100 people. On this occasion the area of intrusion included some of the executive offices as well as the reception area. The duration of the disturbance was approximately an hour. Additionally, there was considerable milling about in the downstairs lobby of the building during this period. Here, too, the police were called and shortly after their arrival the occupiers left AFA’s premises and vacated the downstairs lobby.
In neither case was any arrest made. With respect to the April 13 incident there was some claim of damage. However, at the close of plaintiff’s case this claim was withdrawn.
The outlawry of the sit-down strike as a weapon in labor disputes finds origin in Labor Bd. v. Fansteel Corp. (306 U. S. 240). In that case the union had commenced a sit-down strike on February 17, 1937. The fact situation which developed is cogently described in the opinion. “ On February 18th, respondent obtained from the state court an injunction order requiring the men to surrender the premises. The men refused to obey the order and a writ of attachment for contempt was served on February 19th. Upon the men’s refusal to submit, a pitched battle ensued and the men successfully resisted the attempt by the sheriff to evict and arrest them. Efforts at mediation on the part of the United States Department of Labor and the Governor of Illinois proved unavailing. On February 26th the sheriff with an increased force of deputies made a further attempt and this time, after another battle, the men were ousted and placed under arrest ” (p. 249). In holding that the employer was justified in discharging those who refused to leave when directed by the employer to do so the court held that the seizure and retention of the plant was without shadow of legal right. The complete ousting of the plant authorities from control, the duration of the seizure and the flouting of police authority all played part in this conclusion.
*829 Fansteel (supra), because it involved employee conduct of an extreme nature, had little difficulty in resolving the problem in terms of absolutes. However, in subsequent cases the absence of this definitive clarity has led to shadings of the rule.
The latest case on the subject is National Labor Relations Bd. v. Pepsi-Cola Bottling Co. of Miami (449 F. 2d 824 [C.A. 5th], cert. den. 407 U. S. 910). There six employees within the unit certified by the Labor Board as the exclusive bargaining representatives, dissatisfied with the progress of the bargaining negotiations, engaged in a slowdown. They were promptly discharged. Thereupon 97 other employees within the unit conducted a sit-in. The employer then discharged the 97. The employees did not claim to hold the premises in defiance of the owner’s right of possesion. The police were called and, upon demand by them that the premises be vacated, the employees left. In holding the sit-in a protected activity the court pointed out: “ The mere act of sitting down on the job in order to further discussions with an employer, as was done in the instant case, can alone furnish no basis for a finding that the acts constituted a forcible seizure of the employer’s property. Fansteel (supra), does not so hold, and we know of no case that does. The strikers were not shown to have interfered with the work preformance of non-strikers, and their actions were unaccompanied by violence or threat of violence. The Company would have us hold that any sit-down activity necessarily carries with it a threat of violence sufficient to clothe the employer with the right to discharge those responsible. We reject any such notion. Without more than the mere act of sitting down during a labor dispute, there is no more incitement or probability of violence than is necessarily incidental to any other act.” (p. 829).
In Cone Mills Corp. v. National Labor Relations Bd. (413 F. 2d 445 [C. A. 4th]), a different conclusion was reached. There, a group of employees protested the discharge of a fellow employee by conducting a prearranged sit-in. Upon direction by a company manager some refused to return to work whereupon they were discharged. Upon the refusal of the discharged workers to leave the plant, the police were called and they were arrested. Although the trespassing charges were later dropped for technical reasons, the activity of the discharged employees was held to be outside the protection of section 7 (U. S. Code, tit. 29, § 157).
However, in National Labor Relations Bd. v. Hanes Hoisery Div., Hanes Corp. (413 F. 2d 457 [C. A. 4th]), the same Circuit held the instigation of a sit-down to be protected by section 7. Similarly, in Golay & Co. v. National Labor Relations Bd. (371 *830 F. 2d 259 [C. A. 7th]) the court held that discharges resulting from a sit-down strike were unjustified inasmuch as the activity was protected. It distinguished Fansteel (supra), by pointing out the difference in the duration of the seizure. Like conclusions were reached in Olin Ind., Winchester Repeating Arms Co. Div. v. National Labor Relations Bd. (191 F. 2d 613 [C. A. 5th]) and National Labor Relations Bd. v. American Mfg. Co. (106 F. 2d 61 [C. A. 2d]). In National Labor Relations Bd. v. Clinchfield Coal Corp. (145 F. 2d 66 [C. A. 4th]), the holding was to the contrary.
The variance in factual patterns among these cases makes it somewhat difficult to formulate a rule of empirical application. Nevertheless, it would seem to be their teaching that, where there is legitimate controversy between an employer and a union, the utilization of a sit-in as a form of self-help does not lose its protected status if no endeavor is made to exclude the employer from possession, the sit-in is of brief duration, the strikers leave when directed to do so either by employer or by the police, and there is no interference with the operation of the other phases of the employer’s business.
It is unnecessary, for purposes of this case, to determine whether the sit-ins of March 9 and April 13 were protected activities within the purview of section 7. Indeed, since that falls within the exclusive purview of the Labor Board, it would be improper and, indeed, impertinent to do so. It is necessary to point out only that a sit-in which, arguably, falls within the protection of section 7, is not, in and of itself, violence of such a nature as to confer jurisdiction upon the- State courts.
V ,
One final question remains. Although no single contention advanced by AFA falls within the ambit of State jurisdiction, does the composite of events indicate a pattern of violence which warrants intrusion by the State courts (cf. Hearn Dept. Stores v. Livingston, 282 App. Div. 480) f The short and complete answer lies in the refusal of the Board’s Second Region to issue a complaint against the union. The charges filed by AFA included all of the issues here involved. Under the law the NLRB was required to (and, presumptively, did) investigate these charges. By its refusal to issue a complaint, it necessarily held that the acts complained of were protected under section 7 and were not prohibited by section 8. The effect of such a determination may not be ignored by this court.
Accordingly, the motion to dismiss for lack of jurisdiction is granted^