Max Bloom, J.
By this suit plaintiff seeks a mandatory injunction restoring him to membership in the defendant union; directing that defendant issue a clearance slip requiring his assignment to a specific vessel; and for damages alleged to have resulted from the purported improper dismissal from his job. *18 The motion to dismiss and the cross motion for directory relief pose the issue of Federal pre-emption and the jurisdiction of this court.
I.
At one time more than 20 years ago, plaintiff had been a member of defendant. In 1949, his license was revoked by the Coast Guard. By reason thereof he was no longer eligible to hold a position on a vessel and the union transferred him to inactive status.
The plaintiff stopped paying his union dues after he had lost his license. On March 31, 1950, he was expelled by defendant under a clause of its constitution which provides: ‘1 All members shall pay dues quarterly in advance. All members more than six months in arrears shall be automatically expelled. An expelled member to reenter the Union shall only be able to do so in accordance with the permit card provisions of this Constitution.” Defendant asserts that, at the time of his expulsion, plaintiff was in arrears in the payment of his dues for more than six months. Plaintiff does not deny that he was in arrears in dues payments for the specified time. However, he contends that the union, by placing him in an inactive status, relieved him of the obligation to pay dues. In effect, he asserts that his membership in the union was in a state of suspension and that he became eligible for reinstatement to active membership upon obtaining a job and paying his dues, without payment of any new initiation fee.
Be that as it may, plaintiff thereafter regained his license and, as a permit card holder, the union, in 1969, referred him to a steamship company which placed him on one of its vessels. Under the collective agreement subsisting between the union and the steamship company all employees in the bargaining unit were required to become and remain members of the union within 30 days next following the commencement of their employment.
While the plaintiff paid quarterly dues as a permit card holder, he never paid the required initiation fee. On January 13, 1971, plaintiff was notified by the union that he was required to pay the initiation fee, together with all arrearages in dues, within 30 days. The letter of notification concluded with the sentence ‘ ‘ If such payment is not made, we shall have no alternative than to request your immediate discharge by the Company.” The plaintiff, contending that his transfer to inactive *19 status in 1949 automatically left him with union membership, refused to pay the initiation fee. Discharge from his employment followed.
n
Following his discharge, plaintiff filed an unfair labor practice charge with the National Labor Relations Board charging that the union had violated section 8 (subd. [b], par. [1], subpar. [A] and par. [2]) of the National Labor Relations Act, as amended (U. S. Code, tit. 29, § 158, subd. [b], par. [1], subpar. [A] and par. [2]). That section provides that it shall be an unfair labor practice for a labor organization to restrain or coerce employees in the exercise of rights guaranteed in section 7 (U. S. 'Code, tit. 29, § 157) or to cause or attempt to cause an employer to discriminate against an employee. Section 7 guarantees the right of self-organization for purposes of collective bargaining as well as the right to refrain from such activities.
Sections 7 and 8 (subd. [b], par. [2]) contain certain exceptions which are here most pertinent. Both incorporate by reference so much of section 8 (subd. [a], par. [3]) (IT. S. Code, tit. 29, § 158, subd. [a], par. [3]) as exempts from the prohibited discrimination discharge of an employee for failure to comply with a valid union shop provision of a collective bargaining agreement.
The National Labor Relations Board, Region 2, by letter dated October 26,1971, informed the plaintiff that it had investigated the charges and found them to be without merit. Accordingly, it refused to issue any complaint against defendant. Thereafter, on October 29, 1971, in accordance with the rules and regulations of the NLRB, appeal was taken by plaintiff to the General Counsel of the NLRB from the refusal of Region 2 to issue a complaint. So far as is here indicated that appeal is still pending and undetermined.
The initial action brought by plaintiff against defendant in this court was dismissed, without prejudice, by order of Mr. Justice Gelliitoff, dated October 6, 1971, on the ground that service of process had been improperly made. Thereafter, on October 18, 1971, while plaintiff’s charge was still pending and undetermined before Region 2, this action was instituted.
Ill
The concept of federalism in labor relations finds origin in the interstate commerce and Federal supremacy clauses of the Constitution (U. S. Const., art. I, § 8 and art. VI). It would *20 serve no useful purpose to trace the applicability of the doctrine of pre-emption to labor relations from the initial, tentative determinations (cf. Allen-Bradley Local v. Board, 315 U. S. 740; Auto Workers v. Wisconsin Bd., 336 U. S. 245; Algoma Plywood Co. v. Wisconsin Bd., 336 U. S. 301; Bus Employees v. Wisconsin Bd., 340 U. S. 383) to the emergence of the doctrine as one of general application (Garner v. Teamsters Union, 346 U. S. 485; Weber v. Anheuser-Busch, 348 U. S. 468). It is enough to point out that the full scope of the doctrine soon thereafter found definition in four cases (Guss v. Utah Labor Bd., 353 U. S. 1; Meat Cutters v. Fairlawn Meats, 353 U. S. 20; San Diego Unions v. Garmon [Garmon I], 353 U. S. 26; San Diego Unions v. Garmon [Garmon II], 359 U. S. 236). These decisions made plain that subdivision (a) of section 10 of the National Labor Act (U. S. Code, tit. 29, § 160, subd. [a]), which entrusted power to the board “ to prevent any person from engaging in any unfair labor practice (listed in section 8 of this title) affecting commerce ” vested the board with exclusive power to enforce rights protected under section 7 and to compel cessation of activities prohibited by section 8. Indeed they went further in limiting State jurisdiction by pointing out that ‘ ‘ In the absence of the Board’s clear determination that an activity is neither protected nor prohibited or of compelling precedent applied to essentially undisputed facts, it is not for this Court to decide whether such activities are subject to state jurisdiction. The withdrawal of this narrow area from possible state activity follows from our decisions in Weber and Guss. The governing consideration is that to allow the states to control activities that are potentially subject to federal regulation involves too great a danger of conflict with national labor policy".* (Garmon II, supra, p. 246). And this rule prevailed where the NLRB, as a matter of policy, refused to entertain a proceeding even though the necessary elements of board jurisdiction, as fixed by law, were present (Guss v. Utah Labor Bd., supra).
Notwithstanding the full reach of the doctrine of pre-emption as set forth in these cases some slight residue of jurisdiction still remains in the States. Violence (Youngdahl v. Rainfair, Inc., 355 U. S. 131; Auto Workers v. Wisconsin Bd., 351 U. S. 266; United Workers v. Laburnum Corp., 347 U. S. 656; Auto Workers v. Russell, 356 U. S. 634), mass picketing (Allen-Bradley *21 Local v. Wisconsin Bd., supra), and forms of activity imperiling domestic peace are of such paramount State concern that in the absence of clearly expressed congressional direction, the States are not ousted of jurisdiction (Garmon II, supra, p. 247). Additionally, the States may, under given circumstances, reach out to affect union membership agreements where, under the authority conferred upon the States pursuant to subdivision (b) of section 14 of the act (IT. S. Code, tit. 29, § 164, subd. [b]), State law expressly precludes such agreements (Retail Clerks v. Schermerhorn, 373 U. S. 746).
IV
Thus far we have dealt with the doctrine of federalism in labor matters only as it encompasses the relationship of employer and union. The scope of the doctrine is essential to any understanding of its effect upon the relationship between the union and its members.
The first case involving the latter relationship to come before the Supreme Court (Machinists v. Gonzales, 356 U. S. 617) dealt with a suit in a State court by a member of a union to compel the union to restore him to membership from which he claimed to have been unlawfully expelled and for consequential damages. Basing its holding on the thesis that “ the protection of union members in their rights as members from arbitrary conduct by unions and union officers has not been undertaken by federal law ” (p. 620), the court held that the State was not ousted of jurisdiction even though under appropriate circumstances such expulsion might constitute forbidden discrimination under section 8 (subd. [b], par. [2]) of the Labor Act.
Although Garmon II was decided after Gonzales, no endeavor was made to affect the reach of Gonzales. Not until Motor Coach Employees v. Lockridge (403 U. S. 274) was the conflict squarely presented. In Lockridge, the respondent was a member of the union and was employed by Western Greyhound Lines under the terms of a collective agreement which contained a valid union shop provision. In September, 1959, Lockridge rescinded his checkoff authorization. By consequence, he became obligated to pay his dues directly to the union. The constitution and general laws of the union required that monthly union dues be paid by the 15th day of the month. Arrears running beyond the last day of the second month resulted in automatic suspension from membership. They further provided that where union shop agreements existed arrearage of union dues for one month *22 would result in suspension from membership and removal from employment.
On November 2, 1959, Lockridge was suspended from membership for failure to pay October union dues. Simultaneously, notice was sent to Greyhound and request made that Lockridge be removed from employment. Greyhound complied promptly. A belated effort to cure the default was made by Lockridge. When this was rejected he instituted suit in the State court, contending that the union had wrongfully deprived him of his employment, without just cause; that his suspension was wrongful under the provisions of the union’s constitution and general laws and resulted in a breach of contract between him and the union, with consequent loss of his employment with Greyhound.
Thus, the complaint fell squarely within the ambit of Gonzales. Contrary to the holding in Gonzales, however, the court in Lockridge held that the acts complained of fell within the purview of section 8. Holding that the States were precluded from assuming jurisdiction over matters which fell, arguably, under the jurisdiction of the act, the court pointed out that ‘ ‘ nothing could serve more fully -to defeat the congressional goals underlying the Act than to subject, without limitation, the relationships it seeks to create to the concurrent jurisdiction of state and federal courts free to apply the general local law. Nor would an approach suffice that sought merely to avoid disparity in the content of proscriptive behavioral rules. * * * Conflict in technique can be fully as disruptive to the system Congress erected as conflict in overt policy.” (pp. 286-287).
Thus, the doctrine of Federal pre-emption, now full blown, is applicable, under appropriate circumstances, equally to the relationship of a union with its members as it is to the relationship of union and employer.
V
In the instant case plaintiff filed a charge against the defendant with Region 2. That charge was dismissed after investigation not because it did not fall within the area of proscribed activities but because it was found to be without merit. Appeal is now pending to the General Counsel of the NLRB. Whether or not a complaint is ultimately issued it is clear under Lock-ridge that exclusive primary jurisdiction rests with the NLRB and that this court does not have jurisdiction of the subject matter of the action. Accordingly, the motion to dismiss is granted. The cross motion for a mandatory injunction is denied.

 The quoted portion, although stated in different terms, is subject to the interpretation that Congress intended that activities, within the reach of the National Labor Act, which are neither protected under section 7 nor prohibited under section 8 are within the allowable area of economic conflict.